ns, San Jose Unified School District Board of Education of San Jose, California.   of San Jose, California. Thank you. The United States Court of Appeals for the Ninth Circuit is now in session. Please be seated. Good morning and welcome to afternoon and welcome to the Ninth Circuit Court of Appeals. We are here to hear the case of Fellowship of Christian Athletes v. San Jose Unified School District Board of Education. Before we begin, let me just check with Judge Sung. She's appearing by video. Judge Sung, can you hear me? Good morning. I see you shaking hands. Okay, thank you. If the parties are ready to proceed, you may come forward. Thank you, Chief Judge McGeehan. May it please the Court, being a block of repellents, I'd like to reserve three minutes for a vote. Unlike schools nationwide, the school district here insists that SCA clubs can never have equal access to its campuses for one reason, because SCA clubs require their leaders to agree with their faith. The panel rightly rejected this position under the Free Exercise Clause and the Equal Access Act. The district wants free exercise analysis because it is imposing a double standard. It claims, barring SCA if necessary, to prevent, quote, discrimination and exclusion, end quote. But the district has long allowed a multitude of its programs, sports teams, and recognized clubs to discriminate and exclude. It would even allow a white nationalist club to do so. That double standard is unconstitutional. The district also failed under the Equal Access Act. Preventing a religious group from having religious leaders inherently regulates the religious content of their speech. That's just what the EAA says they cannot do. In response, the district bids me keep slight to this Court's decisions in Alpha Delta Chi and crude 90 times to support the claim that the district's unequal treatment of SCA is permissible because it was not motivated by analysts. That claim is actually wrong, as the opinion by Judge Lee makes clear. It is also wrong in the law, as this Court should make clear. As Professor McConnell explained in his brief, recent press stuff like Tandon, Fulton, and Town of Gilbert show that even truly benign motives cannot justify marginalizing a religious group to the offense of having religious leaders. Turning first to the Free Exercise Clause, this Court begins its analysis with a question of what the government's stated interest is in burdening the religious belief of the plaintiff. And here, the asserted government interest is in preventing discrimination and exclusion. There's any meaningful difference here between the Free Exercise Clause analysis, the speech analysis, and the statutory claim? There are differences, Your Honor. The difference with Free Exercise analysis requires starting with an articulation of the government's interest and then comparing that to any particular comparator to receive favorable treatment. The speech analysis requires doing forum analysis and starting through that process. And then the EAA analysis actually doesn't require doing either of those steps. It just asks whether there is content regulation going on. So content regulation is shown on the text of the rule that's at issue here and the specific application of the rule. If there's viewpoint discrimination, that cuts across all three of those? That's correct, Your Honor. If this Court finds viewpoint discrimination, then all three of those standards would be satisfied. Does the Martinez case address the content issue and whether or not it violates the First Amendment? I know you've got different statutes and different, if you will, approaches, causes of action that you're looking at. But Justice Ginsburg's opinion seems to make clear that, at least in that part of the case, you don't have a lot of traction. What's your response to that? I'll give you the responses on that first. First of all, Your Honor, Martinez is very helpful in making clear that when it comes to religious leadership, who you select is not an expressive choice. So leadership is expressive. But the Martinez case is only about viewpoint discrimination. It's only about viewpoint discrimination in what Justice Ginsburg said was the novel context of an all-commerce policy. This Court does not have an all-commerce policy before. It has a nondiscrimination policy. So it's different from Martinez in a substantial way. The stipulated all-commerce policy was very different by context. Is it distinguishable? Yes, Your Honor, it is distinguishable. What is the relationship between the discrimination policy and the all-commerce policy? In this case, Your Honor, the nondiscrimination policy is the foundational policy. It's the only governing policy, as the record reflects in this case, and that's Board Policy 410. And 5143.5 or, sorry, 5145.3. And that requires that that cuts across all district programs and activities and applies to the ASB student groups as well. And then the district has articulated that it applies that policy in the ASB context requiring an all-commerce requirement. However, they also have language that states that student groups are allowed to impose any nondiscriminatory criteria. The testimony in the case says that that's basically anything but within the nondiscrimination policy. So you immediately come right back to a nondiscrimination policy. So this case is not a Martinez case. It's much closer to Alpha Delta Chi where you're just dealing with a nondiscrimination policy. I have a question about Martinez. In Martinez, Justice Ginsburg held open the question about pretext and said that wasn't before. I'm sorry. I can forget it. But Justice Alito, in his dissent, provides factors that would show pretext. Is there an element in your view that the district enforcement of the nondiscrimination policy or adoption of the all-commerce policy was pretextual for viewpoint discrimination? Absolutely, Your Honor. So the application of the policy is pretextual, not the selective enforcement rationale that the panel correctly found. The school admits that it adopted the all-commerce language, the all-commerce label, in response to SCAs. The whole reason why they started using that label was in response to SCAs. So in terms both of the intent behind it and the application of it, there's certainly a selective enforcement problem. To your question, is there a best argument that this is pretextual? No, Your Honor. No, Your Honor. Is there an argument that what the school district did here is pretextual? Well, I'm sorry. On pretext, Your Honor? Yes, on pretext. On the selective enforcement aspect that the panel found, Your Honor. So the Senior Women's Club, the South Asian Heritage Club, the Big Sisters, Little Sisters Club, Big Sisters, Little Sisters Club was approved by the same school officials that disapproved SCA, and they approved it precisely because it limited leadership and membership to females. Their argument is that those distinctions do not discriminate under the terms of the school policy and state law. What's your response to that? No, I understand their argument to be that they were accidental, right? Accidental? Correct, Your Honor. That's my understanding of what their position is on Senior Women and Big Sisters, Little Sisters. That's obviously not the case. That's what Judge Lee and Judge Forrest correctly found at the panel stage. The district court didn't find that, and I was supposed to give a great deference to the district court on those kind of facts. No, Your Honor, because the issue wasn't the factual questions. Everyone agreed on what the facts show. It's the legal significance of the facts. That's what the issue, and this court has a responsibility to review those. It also has a responsibility under those to review even constitutional facts to know them. So that's the Thunderbolt case that this court recently decided, and also the Green case that addresses that particular issue. That's a high level of more than I've seen in their case. It's a vitriol towards the students and their viewpoints. The fact that it was more than in some cases, what significance is that to your argument? It makes it an easier case, Your Honor. It makes it a very straightforward case. I think Judge Lee's concurrence in the panel opinion lays it out very clearly. I mean, on the merits, is that what you would say? You get to the merits, and then you say, well, they're going to win because the facts are so. I think, Your Honor, that I've litigated a lot of these cases. I've never seen a case with this kind of animus towards a group of children that want to run a religious student club. And so it does make this case much more straightforward than many of the other cases that we've litigated. But you don't have to bind animus in order to rule for SCA. In fact, I don't think it needs to. You were talking about animus, and I asked you about the Masterpiece case. That's one of the things that was alleged. The Supreme Court, in that case, dealt with an adjudicatory body. Our team late case has raised that very important. In your judgment, what was the adjudicatory body in the school district that made the decisions here that brings it within the Masterpiece case? It's clear that the government official who made the decision here was Principal Espiritu, the initial derecognition decision and subsequent derecognition decisions. And he was on the board, the climate committee that met together and within three days had derecognized Pioneer SCA after being on campus for many, many years. So do you think Espiritu is the equivalent of the adjudicatory body in Colorado in the Masterpiece case? Not him alone, Your Honor. The climate committee was also the leadership of the school that was informing the decision-making process, and he said that's what happened. He did, Your Honor. He said that in schools. He announced to the entire school that we have an adjudicatory body. The climate committee and the district looked at Pioneer SCA and decided that they are a discriminatory group and we don't want to be associated with them, so they kicked out. That's what he said. I know later one of the others made some very disparaging comments. What I'm concerned about is if you can just kind of cherry-pick comments by a teacher, I think there were like 1,500 teachers in the school or something like that, and if you have five or six that make disparaging comments, it kind of makes it tough to run an operation. You've got to have somebody that's really responsible. But you get down to Espiritu. He's your guy, right? If he hasn't expressed animus at the level of Masterpiece case, then that cause of action fails. Is that correct? No, Your Honor. And there's a couple different reasons why. So Principal Espiritu was directly involved in the decision-making process, and he was lobbied by Mr. Glasser to derecognize the club in the kinds of terms that you were talking about, and he did it immediately. I mean, one of the things that's really remarkable in this case is the school district had never derecognized a student group for any reason related to its consternation policy until SCA, and they derecognized SCA in 10 days. Very unusual. While they continue to be answering Judge Smith's question, are we allowed to look at the comments of Ms. Baumann, who is on the Climate Committee, that described evangelicals like the FCA as charlatans? Correct, Your Honor. Those are all part of the team that influenced the decision, that were involved in the decision, and continue to protest SCA and support students in protesting SCA in the months and years to come. The other thing, Your Honor, though, is that Mr. Glasser told his supervisor, Principal Espiritu, that he was professionally and morally bound to continue to do the exact same things he'd done before, and Mr. Espiritu said that he never corrected him on that. In fact, the parents of the SCA children found out that they had a request for an investigation for the harassment their children suffered, and the school district refused to perform the investigation. They actually thought it would be or persuaded the California Department of Education not to itself perform the investigation, to allow the school district to perform the investigation, and discovery revealed that they never, in fact, did perform that investigation. So the school district has never told its teachers that what they did with the SCA was wrong, and they have teachers telling them they are morally and professionally bound to do it again. What are we to do with the fact that the thing that is keeping this organization from being recognized today is the policy that was later adopted by the school district, and there's no evidence that Glasser or Bowman made that decision, is there? No, Your Honor. It's one continuous policy. So one of the questions at the oral argument in August was, what are we dealing with here? And the policy, my friend on the other side said this is a continuation of the past practice. They're just formalizing what they've already done before. And so the question is, do you recognize, and that same policy and practice has been enforced throughout, what would the district have to do going forward if it wanted to have an all-comers policy of the sort that Martina says is okay? Like what do they need to do to purge the taint of the earlier comments? I think you'll have a very hard time purging the taint of the earlier comments and how they treated SCA up and through this past semester when they shut down the entire forum to prevent the SCA from being able to meet in concert with other student groups on campus. But, Your Honor, the other issue for them, regardless of the neutrality question, is that they have a very significant general applicability problem that they're not going to be able to solve. Their own programs discriminate against students on the basis of their ethnicity and sex. The district can't say that it has a compelling interest in kicking off SCA for asking a handful of students to agree with their religious beliefs so they can lead in prayers. At the same time, they have programs of that nature that are under the exact same non-discrimination policy that they're imposing on SCA. The same is true for the ASB-approved sports teams. These sports teams are all under the ASB umbrella alongside SCA, and those groups are allowed to discriminate based on sex. So that sounds like a tandem argument, right? So even if, you know, Campbell said that some of the selective enforcement was accidental, you know, that's true. Your Honor, that's still unconstitutional under tandem because the other groups have beliefs and status requirements. That's exactly correct, Your Honor. There are actually six different categories of ways the school is not enforcing its policy in generally applicable manners. The first are the ones we just talked about. The multitude, the record says the multitude of district programs that allow discrimination. Their response is that even if the Latino group says it's a Latino group, it is open to everyone, even despite the fact that they call it a Latino group. That's not what the record shows, though, Your Honor. The record shows that 90 are 18-16. That is for male Latinos. That was principle aspired to. Again, the same principle aspired to, that you recognized SCA and kept them off campus. Was that on one of those forms, those application forms? No, Your Honor. That was a public announcement he gave to the school as he was lauding the male Latino mentorship group, which is great. It's a great thing to do. SCA's concern isn't with programs like that. The concern is that the school district is singling out SCA and saying, you can't have religious leaders for our leisure prayers, but we can have Latino male mentorship groups. There are also the girls circle and boys circle groups that the school runs. Obviously, for girls and boys, it's what they say, and it's what the record shows, that SCA is for 18 in the National Honor Society, where they ask that you have good moral character or things of that nature. You don't even have to get to that far, right? That's correct, Your Honor. That's the next couple buckets down. So the other ones are the non-discriminatory criteria. That would be one of them. So the interact club says you have to have good moral character, so it isn't a good musical club problem. If it was a good musical club, it was okay to have a secular view of moral character. If it wasn't okay to have religious views of good moral character, that's viewpoint discrimination. That's a problem right there. The purpose and benefits of where the white nationalist club comes in. The school district admitted objectionably in an oral argument in August that they won't allow white nationalists groups in, and they can discriminate not in their mentorship and leadership but in their purpose and benefits. So the purpose of the organization can be only to support white nationalists and the benefits of the organization can be only to support white nationalists. And that, Your Honor, is the oral argument at 3124. Also SCR 417 and ER 133, and it talks through those issues. SCR 703 as well. Finally, Your Honor, the last bucket, the last issue that kind of comes up that shows a really severe general applicability problem here is the voting loophole. So the district says SGA is not allowed to ask its leaders at a time to affirm that it actually believes it's safe before it leads the group in prayer and religious observances. They say any group on the back end can vote for whoever criteria they want. And so that means the white nationalist group can't exclude anyone who is not a white nationalist when they do their voting. That doesn't completely undermine the government's stated interest in a non-discrimination policy if you're allowed to do that, and this actually goes to one of the concerns raised in the panel opinion at page 38, number seven, where it talks about how popular groups can plan a forum but then vote how they want and unpopular groups can't, because they don't do that. The district admitted. But this is what my, Your Honor, comments in 61 and 62. If a student chooses to file a complaint, then we're right back where we started. We're right back where we started under the non-discrimination policy. So if you have a popular group, like, say, the senior women, that has been a tradition at Leland for many, many years, then it won't ever be a problem. Things can just rock along. But if you have a group like SCA, which is unpopular, then you make a complaint filed against you, and you don't have to be exactly back where you started. So there are six different ways. This is obviously a very severe general applicability problem for the school. What about all the evidence that the district officials or the decision-makers, which it seems like there was a lot of evidence that showed that principals looked to the district officials for guidance on whether this policy was discriminatory? So, Your Honor, the district's liaison to Pioneer High School was Assistant Superintendent of Command. He testified over and over again that he was not the decision-maker, that he did not tell Principal Asperger what to do. Principal Asperger made the decision. And so the record of evidence here is very clear that Principal Asperger was the decision-maker, and he had the final say. And that would be consistent with how the policy operates as well. So based on what you've argued so far, I guess my question is, is it your position that the district can never implement an all-commerce policy? Not in the context of the secondary high school. That's what Judge Gilliam said in an oral argument last May. It's like looking at how, you know, it's one thing to have a law school, an unusual environment like a law school. That was an issue in Martinez's stipulated record. It's a very different thing to have a high school. And this is what the Second Circuit talked about in the suit case as well. It said, listen, kids are facing discrimination and exclusion every day, all day, in a high school context. And so trying to claim that there's an all-commerce policy just doesn't fit the facts on the ground. So it's not the SBA. It can't be recognized group forever going forward. It can't be. Is that the objection you're seeking? It can't be denied on the basis of its religious leadership requirements. That's the issue. The narrow issue is SBA can't be excluded from recognition because of its religious leadership requirements. Assuming, and this is hypothetical, because obviously, you know, we have a conference. We don't know what people think. But assuming hypothetically that you were to prevail, is there a Ninth Circuit precedent that you feel has been wrongly decided in its intention with what you're asking this court to do? The court doesn't have to overrule any prior precedent, but the court should clear off the law in Alpha Delta Chi from the state of the current state of the law. So Alpha Delta Chi said that even though a religious group was barred from asking its leaders to be religious, that was okay when political groups were allowed to ask their political leaders to be political and ideological groups were allowed to ask their ideological groups to be ideological. You know, the Alpha Delta Chi court said that's a compelling argument, it's a compelling problem the plaintiffs provide to us here. But because there's no evidence that there was bad intent, bias, or animus that motivated the adoption of this policy, it's okay. We get a strict scrutiny. And no, we don't get a strict scrutiny. That's not the law. That's not the law under Tandon. That's not the law under Fulton. It's not the law under the town of Gilbert. So at the time, the accuracy of the law is no longer an accuracy of the law as it stands today. Why shouldn't we overrule that? I think, Your Honor, if the district's argument is that you have to address Alpha Delta Chi, that's the primary merits argument in their en banc petition. And so if the court addresses Alpha Delta Chi, it should state that Alpha Delta Chi is no longer consistent with the law. The fact that Sue was before Martinez, does that affect your argument about the health commerce policy? No, Your Honor. So this is a very important point to Judge Smith's earlier question. Martinez was a First Amendment case. It was not an EAA case. Sue was an EAA case. Truth is an EAA case. Martinez is not. Martinez requires a showing of viewpoint discrimination in order to get relief. The EAA does not require that. The EAA only requires a showing of content discrimination, content regulation. And it's very easy to see content regulation when it comes to preventing a religious student group from having religious leaders. That's exactly what the suit court found. And their holding in that was precisely because of the nature of religious leadership. This is inherently expressive. And that holding has only gotten stronger over time as we've seen cases like Lizanne Tabor and Our Lady in the InterVarsity case called Conlin and the Fifth Circuit, all dealing with the inherently expressive component of religious leadership. And so Sue was correct when it was decided it's only gotten stronger. So bottom line, from your perspective, the Supreme Court's recent case law has shown that the law that our circuit used to rely upon generally is just not applicable here. Things have changed. You're saying we have to get stuck with the Supreme Court. They tell us we have to let them lead us, not the other way around. Do you think they have done that with Tandon and the other cases you mentioned? That's correct, Your Honor. That's correct, Your Honor. And Tandon itself was a reversal of decisions in this court. Also, I think it's true, Your Honor, so Alpha Delta kind of relies on truth to get to its holding about campus. And so that was wrong. So we agree with your selective enforcement claim that the en banc court need to revisit, right? No. The panel is correct. It is application of the selective enforcement claim. I think one of the reasons, though, that the issues here go much broader than just selective enforcement. You know, if we go back down and the district says, okay, find no more senior women or we're going to wipe out all senior women clubs, which would be really unfortunate, right? They've existed for a long time. We're still going to have the exact same problems like what we have under the district's preference for. It's girls' clubs and boys' clubs, you know, the girls' circle and boys' circle and things of that nature, the sports teams. And so this court needs to address this in a way so we're not back here on other emergencies, seeking emergency relief here in the future. Your Honor, I think the key here to make sure I understand what you're saying, I think you're basically saying, practically speaking, it's not going to be possible to purge the student environment of these other groups unless you want to just outlaw all groups. I think that's correct, Your Honor. There's a reason why Martinez was decided on a stipulated record, because in the real world, having communicated a lot of these cases, there are no outlawed numbers policies because they're so detrimental to the functioning of groups, and they're so detrimental to the functioning of religious groups. And so, you know, just practically speaking, following the standard that's laid out from Tandon and Fulton, the very first step is, what's the interest here? The interest is non-discrimination exclusion. And the question is, what does the district do that allows non-discrimination exclusion? Are there any secular exemptions? And they're everywhere. They're just everywhere, all over the record, and they're irreversible. And so I think that's why, if you look at Judge Gilliam's opinion, he doesn't say the words all-commerce policy once, not once, because you recognize that they just don't exist in this kind of environment, not the sincere and real application of how the policy actually operates. Can I take a minute to talk about the standing? Sure, Your Honor. Both the plaintiffs and defendants have submitted these motions for relief to supplement the record with new evidence. And I'm just questioning whether it's an appellate court, whether we are able or we should be sorting through the evidence that's been presented and consider it for this reason. Yes, a couple answers on that, Your Honor. If this court has any doubts about standing, then, yes, it can review the supplement materials that we provided. We don't think it has to. We think the panel got it right when it analyzed organizational and associational standing, because the current record is very clear on standing. There are a lot of these cases out there, the Martinez case, the Walker case, the Intergrants of the Iowa case, the Boynt case, the Wayne State case, the Truth case, the Alpha Delta Chi case. Not a single one of those cases has said religious student groups don't have standing to challenge a categorical bar on their ability to have religious leadership. None of them have. The district doesn't identify a single time that a court has found a religious student group categorically barred for having religious leaders is unable to even challenge that in court. So it's very clear that the panel's decision on standing is correct here. And, Your Honor, I think the national SCA component of this makes it particularly easy, because the district doesn't even really challenge it. You only need to find standing for one party. The only thing I understand that my friend on the other side is saying about the national SCA is that there's not evidence of a prospective harm, prospective ongoing diversion of resources. But that's just not true. If you look in the record at 2 FER 370 paragraph 15, it specifically states that prospective relief is important because there is ongoing mission frustration, ongoing cost to the organization. That's all you need to know to find standing in the course of the case. But there's also no one can test now. Both sides agree that when this court entered the injunction on August 29th of last year, within three days, BC and NM filed their application and sought recognition. And they no longer have the injunction that this court granted them. So they have standing right now, associational standing for the student club and national standing for the organization. No court has ever said otherwise. Is there anybody else? Yes, thank you, Your Honor. Thank you, Your Honor. Suzy Layton on behalf of the Senate Unified School District. We all agree that religious groups must be treated equally to nonreligious groups. And we also know that under Martinez, an all commerce policy is constitutional. The question here is whether the Senate Unified School District has an all commerce policy, and if so, whether it enforces that policy equally. And if not, whether it should be required to cease utilizing that policy or if it can be permitted to go forward so long as it enforces that policy equally. It is not true that the Senate Unified School District has a policy that says it claims to be all commerce, but then says you can have non-discriminatory criteria. That is, anything that does not fall within a protective category, as my just counsel said. The Senate Unified School District's policy says, just as Martinez said, and that's documented in Note 2 of Martinez, that the school district may allow clubs to have non-discriminatory criteria like attendance, like participation, and payment of dues, those types of criteria. That is what the policy that was in place in fall of 2021, which all parties I think agreed is the relevant time period because that's the time period for which they were seeking prospective relief. That was what the policy allowed, was those types of non-discriminatory criteria. It used the words of Martinez. It actually even said, this policy shall be interpreted to comply or to be the same as the policy that the Supreme Court was ruling on in the Martinez case. Aren't we allowed to look at what actually happened? I mean, I'm looking at 7ER-1217 when the school official who enforces the all commerce policy was asked, so for this coming school year, could girls who code limit their membership to students who identify as female? Yes. Could the girls circle do the same thing? Yes. Do we just ignore that? Your Honor, I believe you're referring to the deposition of Ms. Mayhew, who was the activities director of Planned Parenthood. I don't remember the name, but I'm sure you're right. Yes. That deposition actually was before the district conducted its trainings on the all commerce policy. That was one school staff member at one school, and that's before they told her what to say. Your Honor, the record shows in 2021, the other side that submitted the student club applications, there is one group that has a statement in their constitution or their application that is inconsistent with the school district's all commerce policy, and it's clear that Ms. Mayhew went back and forth in that deposition between saying what the school district's charter could not include. She gets inconsistent answers, and that was before she was trained in the school district's all commerce policy, which was a shift, not in substance. It was a shift in the mechanism by which the school district implemented its all commerce policy. But didn't the school district plainly adopt whatever, you wouldn't want to call it an all commerce policy, as a result of the issue that is before us in this very case? Yes, Your Honor. It was a controversy over the fellowship of Christian athletes, which itself had previously been allowed to discriminate by requiring students to sign the application. Because the district was not aware that it was doing so. The district realized that there might be other clubs out there that were discriminating. And so beginning in 2020, during the COVID year, and then fully implemented and trained in the fall of 2021, it required all student groups to sign an affirmation stating that they would not discriminate. What do we do with the point raised by opposing counsel? It sounds to me kind of like a wink-wink deal. If you wanted to sign the paper, then afterward you can vote on any discriminatory basis you wish. What's your response to that? Your Honor, in Martinez, the Supreme Court recognized that students could still consider the views of leaders in deciding whether to elect them. And SCA came to ask as part of its elections process, do you agree with the affirmation, how you feel about same-sex? What should not be done is a student should not be categorically excluded from membership or from leadership and told, you may not even apply. You may not run for office. Let's say that a particular group, say they sign this statement. But before doing so, they tell superintendent or principal, we want you to know that as soon as we are legally recognized, our voting will be based upon an adherence to these state-based items. What would the school district's response be to that? Well, Your Honor, the school district is not going to inquire into what was in students' minds when they voted for particular leaders. But that record does show that if a student … What if they say that's what they're going to do? The record shows that every club has a faculty advisor. Those faculty advisors have to be present at all student club meetings. And if the faculty advisor sees that the group is discriminating, if, for example, the Black Student Union says everybody is welcome, and then a white student comes and they turn them away, the faculty advisor is required, as all school staff are, to report an observed violation of the nondiscrimination policy. It's difficult for me to imagine a student group saying a webinar is positive because each student in a student-run club … I know it's not hypothetical. Okay. No, no, no. We'd like you to count for the hypothetical. Okay. I wasn't in the school district. If a student group … That's not what … No, you're not. That's not what you're being asked. You've been given a hypothetical. If that were … If that happened, what would your answer be? The record shows that Principal Esparidu and other school district officials have said that the students may vote, considering whatever they want. They can consider the views of the people. They can consider whatever they want, and the school district is not going to investigate, conduct an interrogation, into whether SBA considered … That's not hypothetical, because I said in advance, if you've got three students, say, you know, we want to be part of this student organization. We are willing to sign the paperwork, but we want you to know that as soon as this is done and we vote for the leaders, we've got this form here, and they have to assert that marriage exists between a man and a woman and all these other faith-based things that are in this record. What does the school district do then? Because we have at least comments of your opposing counsel that it was, I gather, fairly well-known that after people are in the umbrella that they can pretty much vote any way they want. Your Honor, a student group would not be permitted to require candidates to sign an affirmation or to swear that they would follow an affirmation. Even if they said they would sign the paperwork required to be officially recognized in advance? No, Your Honor. The record is clear that the school district's policy is, even if a student group signs the affirmation, if it turns out that they are actually implementing a discriminatory policy, the faculty advisor and staff would be required to report that and the district would investigate that violation. Also, maybe I have the facts wrong here. Please correct me if I do. But on the Senior Women's Club form that they signed, didn't they write in on the form, notwithstanding our signing it, that we're going to continue to discriminate on the basis of gender, or do I have that wrong? Your Honor, those weren't the words. But what is correct is that there was a blank on the Senior Women's Application form who are your members, and that they said it was female-identified students. It is correct that that should have been viewed as a problem. In the way you responded to Judge Smith's hypothetical, what would happen if somebody said this? Or was the Senior Women's Group then decertified? This became an issue shortly before the preliminary injunction hearing, which at that point the school year was almost over or close to over. There's nothing in the record about what happened with senior women that school year. However, the district has changed its policy, and this is in the supplemental submission that we made, so that there is no longer such a blank. The Fellowship of Christian Ethics complained that there was a blank to fill in. In the fall of 2022, the district has adopted an application process that says you're a member when you sign the club roster, and you lose your membership rights at the end of the school year or if you fail to attend a certain number of consecutive meetings. A few minutes ago you said you agreed that for purposes of this preliminary injunction appeal, what matters is the 2021 policy, and I would assume also forms. So why should we even consider whatever happens after that with the policy and the forms? The policy and the forms would be relevant to the remedy going forward, Your Honor. It also, I think, sheds light on whether it was actually intentional that a senior woman was approved despite having filled in the blank with something that was inconsistent with the district's policy. There's no evidence in the record that this was intentional. In fact, the school district went to great lengths to develop a policy that would be on all fours with the policy in Martinez. It trained its staff. Obviously, it's a district with 1,500 teachers. People make mistakes. A mistake was made when a senior woman was approved. The question is whether the district, by the fact that once that member made a mistake, should be precluded from applying a policy that the Supreme Court has said is constitutional. The policy came later. What came first were all the actions that led to the initial deregulation, and those involved comments by the teachers who were ultimately input to the decision that are fairly disparaging of the viewpoint that this group has. How do you address that piece of this case? Because that seems to be a very significant component of it. Your Honor, I have a few responses. My first response is that those events occurred in 2019. In 2019, the students who were out of the school in 2019 are no longer. They would have graduated by now. But the students who are in this case have the FCA plaintiffs and have damages claims for any harm that took place in 2019 or 2019. Are you saying because the students aren't there anymore, it's their evidence of religious animus in this record? Your Honor, there is evidence that there were individual teachers who very strongly disagreed with FCA's policy requiring students to sign an affirmation and that disagreed with religiously-based discrimination against LGBTQ students or adults. So there's no evidence of religious animus from your standpoint that can take the record as it is? There is no evidence of religious animus by the decision-makers. The record is actually clear that the Climate Committee did not make this decision, that Ms. Bowman and Mr. Glasser, who were the teachers, were not involved in the decision, that the decision was made. The final say, according to the principal, was by the district superintendent. That's at 5 ER 75152. Mr. McMahon's testimony about his role and Mr. Esparito's role, that's the deputy superintendent and the principal, and at 8 ER 1330 and the discussion around those cases, there was not a single statement by the deputy superintendent who said, We have a non-discrimination policy that does not allow student groups to discriminate and excludes students from groups. As you heard from the closing counsel, he said that the Climate Committee was in effect an adjudicatory body that advised the principal who made the decision. You're now saying that the superintendent of schools, and I got it told, is speaking to what he was supposed to do, and he was the decision-making body. Is that correct? Our position is the decision-making body was the deputy superintendent and who consulted with counsel, who said that he said what the district's policy was, but not in all of the schools. It's the principal who actually decides on the individual group applications. But there's no evidence that Mr. Esparito, either of the principal, had any animus towards SCA. One of the things we're having to wrestle with, as you know, the record shows there's a fair amount of animus among the teachers in the school district, and it's a question of how we consider that. In Masterpiece's case, the Supreme Court had an adjudicatory body. Here we have something a little more squishy. But there certainly was religious animus among the teachers. And I guess I'm struggling with how do we just push that to the side, since there was no equivalent to the adjudicatory body of Masterpiece case here. That's because you want him to be everything. But I'm not sure the record shows that. But on the other hand, if we consider every comment from every teacher, it gets completely unwieldy. How do you recommend that we resolve this dilemma? Your Honor, the decision-making body here was the principal of the school, Mr. Esparito, in conjunction with the deputy superintendent, Mr. McMahon. The Climate Committee, the only indication that the Fellowship of Christian Athletes points to that the Climate Committee had any role is a secondhand account. It's not a quote from the principal. It's a secondhand account by a student newspaper. There's substantial evidence in the record. There's really no dispute. It was Mr. McMahon and Mr. Esparito in combination who made this decision. And there's no evidence of any animus. Shouldn't this then be sent back for a further investigation, further discovery, to determine the full extent of the animus? That seems to be what's driving this at this point. If this were a pure all-comers issue, probably it wouldn't have a problem. But we've got a clouded record here. What do you recommend we do? Your Honor, we would not object if this court is concerned that the record isn't clear, has any animus to returning it to the district court for fact-finding. We do believe that that is the proper body for fact-finding. But in any event, what is at issue here is the policy in the fall of 2021, the all-comers policy and whether it can fairly be implemented. Go ahead. In the employment context, it's fairly common that you have a case where the first-line supervisor exhibits determinatory animus, but then the ultimate adverse action is taken by some higher-level person, and maybe there's no evidence that that person is biased. And in that context, I think that the inquiry is usually about approximate causation. We ask whether the bias or animus approximately caused the ultimate decision. Is that a useful way for us to think about the situation that we have here with the teachers who set all this in motion and then the decision made by somebody else ultimately? Your Honor, I understand the analogy. I think if there was evidence that the decision-makers made the decision that they did because they were prompted by the lower-level staff or teachers, then that would be appropriate. But the simple fact that that was what set it in motion, and actually there were two different sets of student complaints. Two students went to the principal and two students went to the teacher, Mr. Glasser, who was one of the teachers who made statements that had been cited as evidence of animus. But there's zero evidence that that had any effect on the principal or on the deputy superintendent. Zero evidence, even though the organization had been recognized for a long period of time, the policy had been the same. There were all these complaints based on what appears to be in the record anti-religious animus, and shortly thereafter they were revoked. But your view is that's no evidence of cause and effect? That's no evidence that the district officials were affected by the people who exhibited animus. It is true that for years the district has had a complaint-driven policy. And as long as nobody complained, the district did not investigate and they did not review whether groups were complying with the policy. The substance of the policy had always been that the district expected that student clubs would admit all students. But the mechanism for enforcement was just that the district would hear complaints, much like enforcement in many contexts. That policy was changed starting once the district became aware that the fellowship of Christian athletes and other groups had been violating the policy, the district moved towards implementation of requiring that all students sign affirmations. And just like the district cannot be held responsible for the animus by one teacher against the fellowship of Christian athletes or the animus that some teachers exhibited against the students who were complaining, the district has 1,500 teachers. Just like that should not forever foreclose the district from enforcing a constitutional policy, a mistake by a single administrator who allows senior women to be approved despite the language on its application should not force the district. How is a sex-based athletic team consistent with the all-commerce policy? Your Honor, the all-commerce policy applies to student clubs, to student-run clubs. It's that the all-commerce policy does not apply to the sports team. I mean, the district could not have an all-commerce policy. It does ability sorting by students. Isn't that a problem in itself, that you're segregating certain types of activities or activities for a non-religious or non-sex-based or non-religious criteria? Your Honor, the district-run programs, those are pedagogical programs that are run by teachers and staff for educational purposes. Those are not the appropriate comparator group to student clubs. That's a forum for student speech, a limited public forum for student speech. So the district needs to say some students can take AP calculus. Those are students who have qualified. Other students can't. The district needs to be able to say some students get the extra services that are provided in special education courses. We have girls' and boys' sports teams so that girls can access sports. We have separate public restrooms. You know, there's a lot of distinctions between a boys' and girls' team and a boys' and girls' club. And I would actually like to clarify one thing for the record. The Latino male mentors group that Your Honor asked about, which was actually before the relevant time period. It was in 2019-2020, I believe. That was a district program. That was not a student club. The student clubs are run by students. They're run for the purposes. The purposes of that limited public forum are so that students can gain leadership opportunities, so that students have things that they can put on their filing table. So you're saying you can discriminate in district-wide programs, discriminate in sports teams, but you can't discriminate in student clubs. Is that what your argument is? Your Honor, in Hayek's case, there was an overall non-discrimination policy that was based on protected groups, non-discrimination that applied to the whole school. And then there was an all-commerce policy that applied to student clubs. That's the whole idea. In Tandon, the policy was a COVID policy. The question was, did worship services that were in people's homes present the same risk of COVID transmission as the other in the world? The all-commerce policy is based off of this non-discrimination principle. And so what you're saying, that only applies to student groups but not athletic groups or district-wide programs. Your Honor, that is exactly what Tandon was getting at, where the interest is just safety from COVID. It doesn't matter what category you're in or what bucket you're in. In that case, Your Honor, given that the interest was safety from COVID, it made sense to look at things that way. Here, the purpose of the all-commerce policy cannot be divorced artificially from the context in which it operates, which is the student club program. We're seeking to develop the student's connection to the school and not allow exclusion on any basis. Sports clubs, student clubs, and district programs. That's a rational basis to distinguish them from or exclude them from non-discrimination principles. Your Honor, I'm not saying that they should be excluded from non-discrimination principles. The school district does have a non-discrimination policy. Whether separate sports teams for girls and boys violate that policy would be a matter for a different case. Generally, the district does sort students in order to fulfill its educational mission. The rational basis is because the district has a student club forum, which, as recognized in Martinez, the purpose of that is to make sure that all students have access to that forum, to those leadership opportunities, to become connected with the school. And so students cannot be excluded from that forum on any basis, other than participation or, you know, if they don't come to club meetings, they can be excluded. But they can't be excluded on any basis. They can be excluded from AP Calculus. A girls' soccer club that was part of the club would not be allowed in a girls' soccer club that was pedagogical would be allowed. Is that what you're saying? Your Honor, the school district runs educational programs, support services like counseling, and the sports teams. Those are school programs for the girls' soccer team. It's okay, but if it's a girls' soccer club, it would violate the nondiscrimination policy. Is that what you're telling us? Your Honor, any student club must admit students, yes, yes. So a girls' soccer team, which is district-run, which is part of the district's program to allow all kids to have access to sports, could segregate by sex. All over the country, sports teams segregate by sex for public colleges and universities and for public schools. If a student formed a club, it would have to be a soccer club. It could be called a girls' soccer club, just like in the Hastings case. There was a Black Law Students Association, and there was a Jewish Law Students Association. But nonetheless, those clubs were a subject. It's always a different way. So if we don't think the district was applying a 100% true all-commerce policy, what would the importance of Martina's have on the issues in this case and, I guess, on the balance of it? Well, Your Honor, in Martina's, there was a question about whether Hastings was uniformly applying it or whether the policy was actually a pretext to disguise discrimination. And so in that case, as here, the appropriate mechanism would be for a remand to determine whether the district's approval of the senior women's club was intentional, which could make it a constitutional problem, or whether that was inadvertent. Here, the district court found that the district was uniformly enforcing its all-commerce policy, that it was not allowing any student clubs to discriminate, that the district programs were appropriately considered separately. And so as in Martina's, if the district is not applying its all-commerce policy, if the court has a question about that, about whether it's being applied uniformly, then the appropriate thing would be for a remand. But you continue to state, to several of my colleagues, that there's a difference between a district-imposed program and a club. I don't get that. What's the difference? The school district, all of the school district's programs are run by faculty and by staff of the school district. The students have no speech rights in those programs. But we've also been told that when you have a club, each one has a faculty advisor who will be right there and call the referee if there's any discrimination. You've got faculty everywhere. I don't see the difference between a district-mandated program and a student club program for purposes of the all-commerce policy. Your Honor, the faculty who are there in the student clubs are not supposed to be running the student clubs. The students run the clubs themselves. If that were the case, then any school district that had a girls' sports team or that had separate public restrooms, as one of the examples that the plaintiffs have pointed out, would also have to allow a Bob Jones University student club that excluded black students if it was for religious reasons. That is not the appropriate imperative of the district's programs. There's a separate forum that has different purposes than the pedagogical programs. This Court and the Supreme Court have given substantial deference to school officials to decide what is appropriate in the educational environment. This is a completely separate matter where it's talking about student clubs that are student-run and whether students can be excluded from that. So from your perspective, there is no valid comparator between a district-run program and a student club under any circumstances. Is that right? I don't know if I can rule out any circumstance, but I would say in this circumstance, certainly. Why isn't there a difference in terms of the comparator analysis between free exercise and free speech? Free speech, you've got to deal with the forum analysis. You don't in the free exercise context. So why is that not a material difference in figuring out the comparators? In the free exercise context, Your Honor, that's governed by TAND. And what would be appropriate would be to look at what is the purpose of the district's policy. The policy that is at issue here that applies to student clubs is the all-commerce policy. That is a policy that applies to the student clubs. And so under the free exercise clause, the question is whether that policy is generally applicable and whether it's neutral. Under the Employment Development Department versus CERN. I'm getting a little too tight. I mean, the policy is we want to be inclusive and let students have a full experience and be able to do anything that they want to choose to do. If we're not limited to the forum analysis, then the questions have been asked about sports teams and other groups, but specifically hone in who can participate based on some criteria. You're not meeting that goal. You're not meeting the goal of being able to do anything that you might possibly want to do because there are rules about some organizations. Why doesn't that matter in the free exercise context? Because the policy that is at issue and that is being evaluated under the free exercise clause is the all-commerce policy. That policy doesn't even apply to the district's programs. The district doesn't admit all-commerce to classes or teams or counseling programs. Is the government effective in adopting the all-commerce policy and consider whether other things that it's doing undermine that objective? Your Honor, the objective here has to be evaluated in the context of the forum that we are looking at. And the Martinez case is the governing precedent when it comes to the school context. The Supreme Court there looked at the clubs at Hastings and said that this serves reasonable purposes, that it's generally applicable under SMIT, and that it passes the constitutional test. You'll have to leave in order of that premise. You have some clubs, like the National Honor Society, that require certification of good moral character. Is that correct? Don't two teachers have to certify that a student has a good moral character? Not in 2021, Your Honor. And the record shows that if one were to look at the Interact Club and at the National Honor Society, they no longer have that requirement there. They're not allowed to have that requirement under the policy. The record shows that the way that that was implemented was very similar to the way that the moral character policy in Martinez was implemented. If you had cheated or if you had been suspended for drug dealing, you couldn't be in the club. But that's no longer permissible under the district's policy. And that is shown if one looks at the applications from 2021. So that's just based off of the formula until now, not the National Honor Society criteria. But each club has to have a constitution and an application that they submit. So whether the National Honor Society requires it or not, I don't know. But the club at San Jose District High Schools may not require it. One can look at 2ER-107. At 2ER-223, those are the Interact Club applications that show that they select their leaders by student, especially those of the opposing counsel argued that there are parts of our cases that are not consistent with Supreme Court case law. Aspects of Alpha Delta Chi, for example, that he argued are not consistent with Supreme Court case law. I just want to give you an opportunity to respond to that. Your Honor, this court does not need to reach the question. The Alpha Delta, aspect of Alpha Delta that we rely on, is a generally accepted principle in constitutional law that an accidental approval of a student group does not violate the Constitution, just like the accidental serving of a prisoner of a non-kosher meal would not violate the Free Exercise Clause if it were truly an accident. In Alpha Delta, there was a policy that applied a nondiscrimination policy that specified certain protected categories to student clubs. That aspect of Alpha Delta does not need to be reached here. Martina does not reach that question. There's no need for this court to decide whether that aspect of Alpha Delta is good law here for you. And I wanted to ask you about standing and whether or not you think plaintiffs have standing here. Your Honor, I know that you have argued in your briefs that supplementing the record should not be allowed. I think that's your position. I'm curious, is it your position that the evidence should be presented to the district court where it's not relevant at all? Your Honor, it's not relevant at all in this appeal, but the evidence certainly can be presented to the district court. In the Peoples v. Woolton case, which this court recently decided, there had been developments after the denial of a preliminary injunction in that case related to Proposition 22, and so the panel sent the preliminary injunction decision back down to the district court. So that would be an option for this panel. For the non-bank court, it would be to send it back to the district court to determine whether circumstances have changed. To the extent that this court is deciding whether the district court abides its discretion, what is relevant is the record that was before the district court, which did not show, as Judge Christensen has had carefully explained, did not show that any student was actually going to apply. I think your firm was arguing that was a legal issue, not a factual issue. What's your position? Your Honor, whether any student was planning to apply is certainly a factual issue. That was a factual issue to be determined on the record that was before the court at that time. Why isn't the National FCA standing in that FCR you testified to, Counsel Knight? The National FCA would only have standing if there were an injury that were going to be caused by the challenged district's policy. The national organization could only be injured by the all-comers club approval process if there were actually students on campus who wanted to apply. There's actually no evidence in the record of an ongoing injury by the National FCA. But even if there were, if there had been past injuries going forward, all that is relevant is whether the district's policy requiring students to sign the all-comers affirmation, whether that would cause an injury to any students. And if that was going to prevent students from applying, then that could cause an injury to the national organization. But if no students were going to apply, then there could be no injury caused by the policy at all. Your Honor, you're correct that we are not saying that the students had to apply. What we're saying is that there had to be evidence that students would have applied if it were not for the policy. That's what the Teamsters Supreme Court case with the futility doctrine is based on says. And if you can't, therefore, just anybody challenge the policy, would that be the evidence that someone is going to be injured? Your position would be that the several declarations from Mr. Lopez are not sufficient. Correct, Your Honor, both because Mr. Lopez cannot say what was in somebody else's head, what they intended to do, and also because Mr. Lopez did not identify a specific student who was going to apply as required by the U.S. Supreme Court's case law, saying that there has to be a clear and impending irreparable injury and a reasonable inference that any prospective applicant would still pay a retribution given the climate of hiding their high school. Your Honor, there's no evidence from any students in the record saying that for speculation by Mr. Lopez. I said it's a reasonable inference. No, Your Honor, I would not agree, Your Honor, Your Honor, the evidence of animus and of student protests against the club was from 2019 and 2020. There's no evidence that that is influencing any students in 2021, 2022, 2023, or most of the students at the school were not even at the school at that time. There's no indication of that. And if a student wanted to submit a declaration and was fearful of retribution, the courts certainly have many mechanisms to protect people who fear retaliation, to file interstitial, to file initials. I guess what I heard was the people when they complained that the district did nothing, like their first student that complained, I think your colleague on the other side, said that when some individual students complained, the district did nothing. Your Honor, the – Against certain teachers retaliation. My discounsel may say that the record is to that effect. There is evidence in the record that the principal did tell the teacher that that was inappropriate, that he counseled him. But the complaint was filed in 2020, just before the COVID shutdown. I think we all remember what the world was like at that time. The evidence in the record is that the school district did intend to investigate that complaint and that there was confusion about who was investigating which complaint and that it was not investigated. That issue is that nobody filed it. Nobody appealed that failure to investigate, and it got lost in the shuffle. That was something that the school district should have investigated. And when the students – No, no, no, I'm saying that they didn't follow up. Nothing was done. No, Your Honor. No, Your Honor. The school district should have done that investigation. So parents did file a complaint. This year they withdrew the complaint, and the school district still investigated. The school district is supposed to investigate student complaints. The school district didn't do a lot of things that it normally does and that it's supposed to do when there was the COVID shutdown. There was a pretty strong disarray in the school district. I'll let you make that conclusion. Okay, Your Honor. In conclusion, I would just say that the school district has applied its policy uniformly when it comes to student clubs, save one exception, the senior women. The school district should not be required to repeat and to expand that mistake, but should be permitted to correct that mistake and to have an outcome as policy that has been deemed to be constitutionally appropriate by the U.S. Supreme Court. And so this court should affirm the district court. But if it does not do so, it should direct the district court to allow the district to continue to enforce its policy in a neutral way and to adopt appropriate remedies to ensure that the Fellowship of Christian Athletes and other religious clubs are treated equally to secondary student clubs into the future. Thank you. Thank you very much. Thank you, Your Honor. Just a few things to clear up on the facts. One, Mr. McMahon, my friend on the other side, correct us that was the liaison between the school and Principal Asperity to testify. I never told Principal Asperity to recognize or derecognize the club. That's at 1333. The district administrative team did not derecognize the club. That's at 1347 and 38. The determination stayed at the school level, 1386. The guidance of Principal Asperity doesn't derecognize FCA 1403. The district does not approve or disapprove of clubs. The district is not responsible for making ASB recognition determinations. That's at 1320 to 21. In fact, Mr. McMahon testified that he doesn't even know the details of what transpired at the school level at the 1330. Also, the statement that this was all accidental with senior women, FCA had been on campus for years without any difficulty whatsoever. It was derecognized in 10 days because Mr. Glashowin's Principal Asperity had started saying things that were inappropriate to say in this courtroom. Senior women was on the radar of the district for years. It was on the radar of the district for months, and we brought it before the district court. Senior women was never derecognized. The issue wasn't just forms. The issue was the district's behavior here. The district said they accidentally didn't investigate because of COVID. The district tried hard to prevent the California Department of Education from investigating because of COVID. In fact, there's an e-mail trail between district officials celebrating that the Department of Education didn't investigate and that they were backing them. Then they suddenly forgot lots of accidents happening at the district. You heard no response to Judge Gilliam's determination that there was not or Judge Gilliam's refusal to treat this as an all-commerce response, all-commerce policy. Not a single word on it. At one point in your brief, you seem to argue that the FCA does not actually grant these students leadership. That's correct, Your Honor. So did the district court in question legal society versus Martinez reject that exact distinction between status and conduct that you alluded to in your brief? The Martinez court was not persuaded by that particular point. That doesn't change. The court recognized that the religious groups are allowed to have their religious views on this. An FCA student who identified as gay or lesbian would be welcome to be a leader if they share the group's religious beliefs. Your Honor, the district did not cite a single case on standing where a religious student group was unable to challenge a policy that categorically barred it from access to campus. The Martinez case did not conduct forum analysis. It actually conducted very specific forum analysis for both the free speech and free association claims, and it had distinct analysis under free exercise and footnote 27. It's very different from what the district has for hearing. I just want to be clear. So you acknowledge or admit that your argument is inconsistent with Martinez? Not at all, Your Honor. I thought you just acknowledged that. No, Your Honor. The point there was just that the district didn't buy or the Martinez court didn't care about the religious belief as it turned on that particular issue. But that doesn't change this court's analysis on the VAA or the free exercise clause. And what's your best case for standing at this point in time? Your Honor, I think any of the cases on standing that we cite in the briefing. You have been delayed at this stage in this proceeding. I guess to ask for supplemental briefing, do you have any case that supports your authority for that, any authority for your argument to allow for supplemental briefing at this point or to supplement the record? Oh, sorry. Yes, Your Honor. Yes, the cases we cite I think are pretty legion on that. This court in the recent journalist decision and the GEO group decision that this court just heard about allow not just record supplementation. I think Judge Smith and the counsel for the government make the representation that you're going to do the thing that's an issue. I'm making the representation to this court today that Pioneer SCA plans to apply. That's what they told this court. That's what the record shows. Standing is straightforward. That's the reason why Judge Dillon didn't even find it worth his time. How about that's limited to the record and before the district court? Not for the purpose of the standing, Your Honor. For the purpose of the merits, yes. But if this court was concerned on the issues of disability, it's very clear that this court can consider those issues. Now, it doesn't have to. Your Honor, the other thing is we have the record shows that at the time that they were seeking the inductive relief, N.M. had filed a form saying that she intended to be a leader of her SCA club. That was August 2021. It's 1 FER 276. She had actually conducted training with SCA so that she could be a leader of her club. It was just the next month that Mr. Lopez filed a declaration saying the leaders of SCA plan on applying for recognition if this court grants an injunction. She also applied for leadership just after that. That's the 1 FER 265. It's very clear in the record, Your Honor. I'm sorry. I think you also need to go back to your argument. I'll give you a chance to make a conclusion. Thank you so much, Your Honor. Your Honor, I think the last point I want to make here is the district said that the teachers very strongly disagreed with SCA's religious beliefs, and that's what the issue is. It's not the problem. People are welcome in America to disagree on issues of religion and sex. We do it all the time. It's a good thing. It's a healthy part of our democracy. It's not right to use governmental power to exclude children from an equal access to a forum on school. How about a clerk who never gave back her senior year? Neither will Elizabeth Sinclair. How about him who has spent the entirety of four years at the high school being told that she isn't good enough to have equal access because of her religious beliefs? These are students that are being barred right now. They're being told right now by their school district, by government officials, that there's something wrong with them, that they are discriminatory and they aren't welcome to have equal access to campus. That's a violation of the First Amendment. It's a violation of what Congress passed in the EAA. We respectfully request this court we grant would issue a decision, find the right person that we have time to prepare for next year or seek a heart and soul relief if that's necessary. Thank you very much. Thank you, Mr. Blumberg and Ms. Latham, for your informative presentations here today. The case of Fellowship of Christian Athletes v. SAMHSA is taken by the School District Board of Education. They'll submit it. We are adjourned. Thank you. Thank you.
judges: MURGUIA, CALLAHAN, SMITH, IKUTA, BENNETT, MILLER, BADE, BRESS, FORREST, BUMATAY, SUNG